Frank O. SEMBERA, Appellant/Cross-Appellee,

v.

PETROFAC TYLER, INC. and Petrofac Limited, Appellees/Cross-Appellants.

No. 12–06–00373–CV.

Court of Appeals of Texas, Tyler.

March 26, 2008.

Rehearing Overruled June 11, 2008.

---

M. Keith Dollahite, Ron Adkison, Charles H. Clark, Leigh C. Porter, for Appellant.

Ken W. Good, John C. Hardy, David J. Bush, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

JAMES T. WORTHEN, Chief Justice.

Frank O. Sembera appeals the trial court's judgment denying him the recovery of stock he once owned in his former employer, Petrofac Tyler, Inc. ("PT"), and the recovery of stock from a related company, Petrofac Limited ("PL"). Instead, the trial court awarded Sembera $105,269.40 for five thousand shares of stock he owned in PT until December 31, 2001.

In four issues, Sembera contends the trial court erred by not restoring his stock in PT, that the evidence was not legally or factually sufficient to support the trial court's judgment, that he could not be forced to sell his shares of stock when he was terminated, and, in the alternative,

that he was entitled to prejudgment and postjudgment interest on his award. In one cross issue, PL contends the judgment in favor of Sembera was erroneously entered against it. PL also brings three conditional cross issues relating to its status as a party to the action.

We affirm Sembera's judgment against PT. We reverse Sembera's judgment against PL and render a take nothing judgment in its place.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 1, 2000, Sembera, a senior cost engineer, began purchasing shares in his employer, PT, a worldwide energy exploration company. PT had been a Subchapter S corporation since 1986. By 2001, PT had fifty-one shareholders who owned a total of 855,000 shares. Sembera owned 5,000 of these shares. Each of these shareholders and their spouses had entered into a stock purchase agreement with PT. One of the major purposes of this agreement was to protect the corporation's 1986 Subchapter S election. Section 13(a)(ii) of the agreement stated that "no shareholder shall take any action or inaction which will result in the termination of the S Corporation election unless all of the other shareholders and the corporation consents to such action or inaction." [1]

In January of 2001, PT shareholders were notified that there was a likelihood of a change in PT's structure during that calendar year. In October, details were given in a shareholder meeting regarding PT's plans to sell its assets to a soon to be created foreign company, PL. The current PT shareholders would have the option of becoming owners in the new company. The new company's purpose was to obtain an equity investor or become a publicly traded company so that more capital could be generated to fund business operations. On November 19, another PT shareholder meeting was held and more than two-thirds of the shareholders voted to sell substantially all of PT's assets to the new company. During that meeting, the following "Notice Of Shareholder Election" was given to each PT shareholder:

### PETROFAC TYLER, INC. NOTICE OF SHAREHOLDER ELECTION

Shareholder's Name _____ (Shareholder)

Date: November 27, 2001

At a shareholder meeting of Petrofac Tyler, Inc. held on November 19, 2001, more than two-thirds of the shareholders of Petrofac Tyler, Inc. voted to accept the recommendation of the Board of Directors to sell substantially all the assets of Petrofac Tyler, Inc. As a result of this transaction, I understand that as

---

1. Taxation is one of the most important economic considerations when choosing a business form. *See* Robert W. Hamilton, *Texas Practice: Business Organizations* § 1.13 (2d ed.). A major factor among taxation issues is that of federal income taxation. *See id.* § 4.7. Ordinarily, stockholders in a corporation are effectively taxed twice, once when the corporation is taxed on its earnings, and then a second time when dividends are paid to the stockholders. *See id.* However, when a corporation meets certain requirements, it can elect to be taxed as a Subchapter S corporation and therefore avoid the initial federal tax

on its earnings. *See id.* Significant requirements for Subchapter S eligibility are that

(1) the corporation must not have more than one hundred stockholders;
(2) all the stockholders must be individuals, qualified estates or trusts, or certain tax exempt organizations;
(3) no stockholder may be a nonresident alien; and
(4) the corporation must not have more than one class of stock.

*See* 26 U.S.C.A. § 1361(b)(1) (West, Westlaw through May 2007 amendments).

a Petrofac Tyler, Inc. shareholder, I can elect to receive cash and further receive, separate from the cash, stock in a new holding company to be formed outside the United States in exchange for the sale of the assets or I can elect to redeem my shares of Petrofac Tyler, Inc. under the terms of the Stock Purchase Agreement dated March 9, 2000.

This constitutes my notice to Petrofac Tyler, Inc. of my irrevocable election. I hereby irrevocably elect to (Check only one box)—

_____ Receive cash and, separate from the cash, stock in a new holding company formed outside the United States following the sale of substantially all assets of Petrofac Tyler, Inc. in accordance with the terms negotiated by the Board of Directors of Petrofac Tyler, Inc.

Or

_____ Redeem _____ of Shares ... of stock I own in Petrofac Tyler, Inc. at a per share value as of December 31, 2001, according to the formula set forth in Section 4 of the Stock Purchase Agreement and, based on the remaining shares I own in Petrofac Tyler, Inc., receive cash and separate from the cash, stock in a new holding company formed outside the United States following the sale of substantially all assets of Petrofac Tyler, Inc. in accordance with the terms negotiat-

ed by the Board of Directors of Petrofac Tyler, Inc.

Or

_____ Redeem all of my shares in Petrofac Tyler, Inc. at a per share value as of December 31, 2001, according to the formula set forth in section 4 of the Stock Purchase Agreement.

_____

Signature

_____

Printed Name

Shareholders were asked to make an election by November 26, 2001 so that the necessary documentation to effectuate their decision would be in place by December 31, 2001. The purpose of this election was to determine which PT shareholders wanted to become shareholders in the new company being formed. By early December, fifty of the fifty-one PT shareholders had made an election, with Sembera being the lone holdout.

Correspondence and meetings between Sembera and Philip Norton, a consultant hired by PT to put together and implement the transitional plan, occurred throughout December.[2] On December 22, Sembera sent the following email to Norton:

**From:** Frank Sembera

**Sent:** Saturday, December 22, 2001 4:04 PM

---

**2.** Norton testified that the election was necessary so that PT's Subchapter S election would not be revoked by the Internal Revenue Service ("IRS"). Gregory Hendrickson, chief financial officer, corporate secretary, and a major shareholder in PT, testified that the failure of any shareholder to make an election could have jeopardized PT's Subchapter S election. Regarding Sembera's failure to make a decision, Hendrickson testified that "if [Sembera] would continue to have sat on the fence, that would have jeopardized our S [corporation] election by the creation of a

second class of stock." Hendrickson also stated that "we were a Subchapter S Corporation, we could not have two classes of stock. Two classes of stock would have created horrific tax consequences that ... could have prevented the reorganization plans." "We had to know [who from] our shareholder base was going into [the new company] and who did not want to go into [the new company]. We didn't have three options. We had two options. You had to get in, or you had to get out."

**To:** Philip Norton

**Subject:** Petrofac Tyler, Inc. Restructure

Personal and Confidential

December 22, 2001

Philip Norton

Petrofac

Re: Petrofac Tyler, Inc. Restructure

My attorney advised me that the actions taken and to be taken by Petrofac contemplate a merger pursuant to the Texas Business Corporation Act. He advised that additional documentation, information and notice were required to be furnished to me in connection with the proposed merger. He also advised that Petrofac did not provide requisite information for the proposed merger or sale of assets.

Since I have not been given proper opportunity to dissent from the proposed merger or sale of assets, I hereby formally register my dissent to the proposed merger and sale of assets and in accordance with the Texas Business Corporation Act request payment of fair value for my shares.

Should you have any disagreement with this request, please let me know at your earliest convenience.

Frank Sembera

Based upon Sembera's email, on December 31, PT included Sembera's 5,000 PT shares with 40,300 shares of other PT shareholders who did not want to become a part of the new corporation and sold these shares to PT's three largest shareholders, Ralph Martin, Louis Owen, and Gregory Hendrickson. The new company, PL, was formed on January 10, 2002. Three days later, PT sold virtually all of its assets to PL in exchange for shares of PL stock. These PL shares were then distributed to the shareholders on PT's books as of January 1, 2002. Following notification by PT of the completion of the asset sale to PL, Sembera sent Norton and Hendrickson the following email on February 8, 2002:

**From:** Frank Sembera

**Sent:** Friday, February 8, 2002 4:41 PM

**To:** Philip Norton

**Cc:** Greg Hendrickson

**Subject:** Petrofac Tyler, Inc. Stock 2/8/02

*Personal and Confidential*

Phil,

Petrofac advised shareholders and employees on January 30, 2002 that actions submitted for shareholder approval at the November 19, 2001 special meeting of Petrofac Tyler, Inc. shareholders had been effected. Therefore, in accordance with the Texas Business Corporation Act and my previous dissent(s), I submit this demand for payment of fair value for my 5,000 shares of Petrofac Tyler, Inc. stock.

The estimated fair value per share of Petrofac Tyler, Inc. stock on November 18, 2001 is $504.02 per share. This value is based on: 1.) market valuations of comparable publicly traded companies, 2.) adjustments for earnings and cash flow multiples to growth rates and 3.) Petrofac evaluations and projections.

You previously recommended that the most efficient way to resolve this was to have our attorneys communicate. I provided my attorney's phone number on January 8. Since then, I believe there have been two phone discussions between the attorneys. I understand that they have had difficulty in contacting one another.

Please let me know if you have any questions or if you would like to discuss.

Frank Sembera

On February 19, 2002, PT responded to Sembera's email with the following letter:

February 19, 2002

*Via hand delivery*

*Return Receipt Requested*

Mr. Frank Sembera

[address]

Re: Your February 8, 2002 demand for fair value of shares in Petrofac Tyler, Inc.

Dear Frank:

Please accept this letter as a formal response and notice to your recent communications concerning the fair value of shares in Petrofac Tyler, Inc. First, you are not entitled to any rights under article 5.12 of the Texas Business Corporation Act because you failed to comply with the requirements of 5.12. Second, your demand for payment of $504.02 per share for 5,000 shares is absurd and, therefore, rejected.

Without waiving Petrofac Tyler, Inc.'s right to contest and challenge your rights under article 5.12, Petrofac Tyler, Inc. estimates that the fair value, as of November 18, 2001, of the 5,000 shares you owned is $54.00 per share, as documented under the Petrofac Tyler, Inc. Stock Purchase Agreement. Petrofac Tyler, Inc. agrees to pay this amount to you, less the amount you owe to Petrofac Tyler, Inc., within ninety (90) days of January 13, 2002.

Petrofac Tyler, Inc.

By: _____

Gregory L. Hendrickson, Secretary

When the parties failed to reach an agreement on the amount Sembera was to be paid for his 5,000 shares of PT stock, Sembera filed suit against PT and PL. During a bench trial in early 2006, Sembera sought restoration of his PT stock and also inclusion in the distribution of shares of PL stock. The trial court entered a judgment denying Sembera this relief but awarding him $105,269.40 as the value of his PT shares under the stock purchase agreement. The trial court then entered findings of fact and conclusions of law in support of its judgment. Sembera appeals the trial court's judgment.

## RESTORATION OF STOCK

In his first issue, Sembera contends that his status as a shareholder was automatically restored because of the trial court's determination that he was not entitled to relief under Texas Business Corporation Act's dissenting shareholder provision. Therefore, he argues, he was entitled to receive the PL shares distributed in return for his 5,000 shares of PT stock and all dividends paid while his dissent was pending. The specific portion of the act upon which Sembera relies states that

> if after the hearing of a petition filed pursuant to Article 5.12 or 5.16, the court shall determine that such shareholder is not entitled to the relief provided by those articles, then, in any such case, such shareholder and all persons claiming under him shall be conclusively presumed to have approved and ratified the corporate action from which he dissented and shall be bound thereby, the right of such shareholder to be paid the fair value of his shares shall cease, and his status as a shareholder shall be restored without prejudice to any corporate proceedings which may have been taken during the interim, and such shareholder shall be entitled to receive any dividends or other distributions made to shareholders in the interim.

TEX. BUS. CORP. ACT ANN. art. 5.13, § C (Vernon 2003).

This issue is a direct attack upon two of the trial court's conclusions of law, which state as follows:

10. Plaintiff cannot be restored as a shareholder of Petrofac Tyler, Inc. because restoration would prejudice the actions of Petrofac Tyler, Inc.

11. Petrofac Limited cannot be compelled to issue shares to Plaintiff or his spouse because to do so would prejudice the actions of Petrofac Limited.

These conclusions of law, which are supported by implicit underlying findings of fact, are also supported by one explicit finding of fact:

24. The corporate proceedings of Petrofac Tyler, Inc. would be prejudiced if Plaintiff was restored to his 5,000 shares in Petrofac Tyler, Inc.

Sembera argues that this finding of fact and the two conclusions of law are not supported by legally and factually sufficient evidence.

### Statutory Interpretation and Standards of Review

In our analysis, we must consider the applicable methodology of statutory interpretation and the three applicable standards of review.

#### Statutory Interpretation

■ The interpretation of a statute is a question of law. *In re Canales*, 52 S.W.3d 698, 701 (Tex.2001) (orig.proceeding). Therefore, we review a trial court's interpretation of a statute de novo. *Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 561 (Tex. App.-Tyler 2007, pet. denied) (citing *Smith v. Smith*, 22 S.W.3d 140, 149 (Tex.App.-Houston [14th Dist.] 2000, no pet.)). When performing a de novo review, we

exercise our own judgment and redetermine each legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex.1999). We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Canal*, 238 S.W.3d at 561 (citing *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex.App.-Houston [14th Dist.] 1996, no writ)).

The Texas Code Construction Act governs the interpretation of statutory codes enacted by the 60th or a subsequent legislature as part of the state's continuing statutory revision program. *See* TEX. GOV'T CODE ANN. § 311.002 (Vernon 2005). Chapter 312 of the Texas Government Code governs the interpretation of civil statutes enacted by Texas legislatures prior to the 60th legislature. *See* TEX. GOV'T CODE ANN. §§ 312.001–.016 (Vernon 2005). The Texas Business Corporation Act was enacted by the 54th legislature and has not been officially incorporated into the Texas system of subject matter codes. Instead, the act remains part of the collection of revised civil statutes and continues to be titled as an "act" and not a "code." TEX. BUS. CORP. ACT ANN. art. 1.01, § A (Vernon 2003). Therefore, we should apply the methods of interpretation set forth in Government Code chapter 312 when interpreting the Business Corporation Act.[3] *See* TEX. GOV'T CODE ANN. §§ 312.001–.016.

Under chapter 312, "[i]n interpreting a statute, a court shall diligently attempt to ascertain legislative intent and *shall consider at all times* the old law, the evil, and the remedy." TEX. GOV'T CODE ANN. § 312.005 (emphasis added). *But see Sheppard v. Lone Star Gas Co.*, 195

---

3. Where the Code Construction Act does not conflict with chapter 312, and when it is reasonable to do so, it may also be appropriate to consider methods set forth within the Code Construction Act, unless it appears that the legislature has chosen not to apply those

methods to uncodified civil statutes. *See* TEX. GOV'T CODE ANN. § 311.025 (Vernon 2005) (addressing situations of irreconcilable statutes); *cf.* TEX. GOV'T CODE ANN. § 311.026 (Vernon 2005) (addressing the interplay between specific and general statutory provisions).

S.W.2d 1013, 1016 (Tex.App.-Austin 1946, writ ref'd) (stating that legislative intent is to be arrived at, if possible, from the language of the statute itself). Chapter 312 further provides as follows:

> (a) The Revised Statutes are the law of this state and shall be *liberally construed to achieve their purpose* and to promote justice.

> (b) The common law rule requiring strict construction of statutes in derogation of the common law does not apply to the Revised Statutes.

TEX. GOV'T CODE ANN. § 312.006 (emphasis added). Chapter 312 instructs that "words shall be given their ordinary meaning." TEX. GOV'T CODE ANN. § 312.002(a). However, "[i]f a word is connected with and used with reference to a particular trade or subject matter or is used as a word of art, the word shall have the meaning given by experts in the particular trade, subject matter, or art." TEX. GOV'T CODE ANN. § 312.002(b).

Under chapter 312, "[a] grammatical error does not vitiate a law. If the sentence or clause is meaningless because of the grammatical error, words and clauses may be transposed to give the law meaning." TEX. GOV'T CODE ANN. § 312.012(a). Likewise, the "[p]unctuation of a law does not control or affect legislative intent in enacting the law." TEX. GOV'T CODE ANN. § 312.012(b). Finally, Texas has a well developed body of common law that provides tools for statutory interpretation and predates both chapter 312 and the Code Construction Act.[4] Under the common law, statutes should be read as a whole and construed to give meaning and purpose to every part. *Ex parte Pruitt,* 551 S.W.2d 706, 709 (Tex.1977) (orig.proceeding).

### Evidentiary Sufficiency

Article 5.13, section C of the Business Corporation Act provides a dissenting shareholder a right to restoration "without prejudice to any corporate proceedings which may have been taken during the interim." TEX. BUS. CORP. ACT ANN. art. 5.13, § C. As such, the issue of prejudice, where applicable, may be raised as a defense to a dissenting shareholder's restoration. *Cf. Canal,* 238 S.W.3d at 556 (construing a statute negating liability for consensually incurred towing fees as a defense to towing fee recovery actions brought against a third party insurance company); *Brown & Root, Inc. v. Shelton,* No. 12–01–00259–CV, 2003 WL 21771917, at *2 (Tex.App.-Tyler July 31, 2003, no pet.) (not yet released for publication) (construing a statute of repose as a defense to a personal injury action based on strict liability or negligence). Here, the existence of prejudice was a question of fact. *See Pepe Int'l Dev. Co. v. Pub Brewing Co.,* 915 S.W.2d 925, 931–32 (Tex.App.-Houston [1st Dist.] 1996, no writ) (treating the existence of prejudice as a question of fact). A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence support-

---

4. As we have explained above, chapter 312, and not the Code Construction Act, governs our review of article 5.13, section C. Therefore, where chapter 312 does not contradict these common law rules of statutory interpretation, and when the common law rules would otherwise be appropriate for use, they should be considered. Where these common law rules contradict the Code Construction Act, we must disregard the suggestions contained within the Code Construction Act and follow the common law if that common law is binding precedent. *Cf. In re Doe,* 19 S.W.3d 249, 253 (Tex.2000) (Texas Supreme Court had the power to set forth the appropriate standard to be applied by lower courts when determining evidentiary sufficiency).

ing a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

■ When reviewing a finding of fact for legal sufficiency, we may set aside the finding only if the evidence at trial would not enable a reasonable and fair minded finder of fact to make the finding under review. *Canal*, 238 S.W.3d at 557 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005)). In making this determination, we must credit favorable evidence if a reasonable finder of fact could, and disregard contrary evidence unless a reasonable finder of fact could not. *Id.* The finder of fact is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *Canal*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 819). The finder of fact is free to believe one witness and disbelieve another, and reviewing courts may not impose their own opinions to the contrary. *Id.* Accordingly, reviewing courts must assume that the finder of fact decided all credibility questions in favor of the verdict if a reasonable person could do so. *Id.* If a reasonable finder of fact could have done so, we must assume that the finder of fact chose what testimony to disregard in a way that was in favor of the verdict. *Canal*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 820). A finder of fact "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses" where reasonable. *Canal*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 819–20).

In addition, it is within the finder of fact's province to resolve conflicts in the evidence. *Canal*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 820). Consequently, we must assume that, where reasonable, the finder of fact resolved all conflicts in the evidence in a manner consistent with the verdict. *Id.* Where a reasonable finder of fact could

resolve conflicting evidence either way, we must presume the finder of fact did so in favor of the verdict. *Canal*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 821). Where conflicting inferences can be drawn from the evidence, it is within the province of the finder of fact to choose which inference to draw, so long as more than one inference can reasonably be drawn. *Id.* Therefore, we must assume the finder of fact made all inferences in favor of the verdict if a reasonable person could do so. *Id.*

■ Regarding factual sufficiency challenges, where a party who did not have the burden of proof on an issue asserts that the trial court's finding of fact is contrary to the evidence, we must overrule the complaint unless, considering all the evidence, the finding is clearly wrong and manifestly unjust. *Santa Fe Petroleum, L.L.C. v. Star Canyon Corp.*, 156 S.W.3d 630, 637 (Tex.App.-Tyler 2004, no pet.) (citing *Garza v. Alviar*, 395 S.W.2d 821, 823, (Tex.1965)). In conducting our review, we must consider, weigh, and compare all of the evidence that supports and that which is contrary to the finding. *See Sosa v. City of Balch Springs*, 772 S.W.2d 71, 72 (Tex.1989). "Reversal [can] occur because the finding [is] based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof." *Santa Fe Petroleum*, 156 S.W.3d at 637.

When reviewing factual sufficiency issues arising from a bench trial, we must remember that the trial court, as the trier of fact, is the sole judge of the credibility of the witnesses. *Canal*, 238 S.W.3d at 557 (citing *Santa Fe Petroleum*, 156 S.W.3d at 638). The trial court may take into consideration all of the facts and surrounding circumstances in connection with the testimony of each witness and accept

or reject all or any part of that testimony. *Canal,* 238 S.W.3d at 557–58 (citing *Santa Fe Petroleum,* 156 S.W.3d at 638). Where enough evidence is before the trial court so that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence, we may not substitute our judgment for that of the trial court. *Canal,* 238 S.W.3d at 558 (citing *Santa Fe Petroleum,* 156 S.W.3d at 638).

### Discussion

Before the 1955 enactment of the Business Corporation Act, there was no statutory authorization for dissent by shareholders and, as a general rule, dissenting shareholders had no legal right to recover compensation for their shares of stock. *See* TEX. BUS. CORP. ACT ANN. art. 5.11, Comment of Bar Committee–1955. In 1967, the legislature amended article 5.13, section C, explicitly setting forth a right of restoration.[5] *See* Act of June 17, 1967, 60th Leg., R.S., ch. 657, 1967 Tex. Gen. Laws 1723–24. In its current form, the statute plainly states that a dissenting shareholder may have his status as a shareholder restored "without prejudice to any corporate proceedings which may have been taken during the interim." TEX. BUS. CORP. ACT ANN. art. 5.13, § C. The 1967 comment to that article states:

> The new Section C makes it clear that the position of the dissenting shareholder after demand for payment is not rigid....
>
> [Where appropriate, a shareholder may seek restoration] except that he has no right to prejudice any corporate proceedings which may have been taken in the interim.

TEX. BUS. CORP. ACT ANN. art. 5.13, Comment of Bar Committee—1967.

As we stated earlier, chapter 312 mandates that "[i]n interpreting a statute, a court shall diligently attempt to ascertain legislative intent and *shall consider at all times* the old law, the evil, and the remedy." TEX. GOV'T CODE ANN. § 312.005 (emphasis added). Here, the "old law" is the 1955 Business Corporation Act, which did not explicitly contain a right of restoration. *See* Act of April 15, 1955, 54th Leg., R.S., ch. 64, 1955 Tex. Gen. Laws 282 (the 1955 version of section 5.13). The "evil" is both the 1955 Business Corporation Act, because it did not explicitly provide such a right, and the common law at the time, which was considered by the legislature to include a "rigid" interpretation of that act. *See* TEX. BUS. CORP. ACT ANN. art. 5.13, Comment of Bar Committee–1967. Thus, the "remedy" is the amended version of article 5.13, section C, which explicitly contains a right of restoration.

■ However, the plain language of a statute is often the best indicator of legislative intent. *See, e.g., Canal,* 238 S.W.3d at 563 ("This question is better answered by unambiguous statutory language rather than legislative history."). The plain language of article 5.13, section C indicates that it was the intent of the legislature to impose as a condition precedent to a shareholder's restoration that the restoration not prejudice any corporate proceedings that have been taken in the interim. *See* TEX. BUS. CORP. ACT ANN. art. 5.13, § C. Further, considering legislative history, and specifically the old law, the evil, and the remedy, it is still clear that the legislature intended such a condition precedent. *See* TEX. BUS. CORP. ACT ANN. art. 5.13, Comment of Bar Committee—1967; *see also* TEX. BUS. CORP. ACT ANN. art. 5.11,

---

5. The 1967 version of the statute is, with minor revisions not pertinent here, the version before us for interpretation. *Compare* TEX. BUS. CORP. ACT ANN. art. 5.13, § C *with* Act of June 17, 1967, 60th Leg., R.S., ch. 657, 1967 Tex. Gen. Laws 1723–24.

Comment of Bar Committee—1955; Act of April 15, 1955, 54th Leg., R.S., ch. 64, 1955 Tex. Gen. Laws 282; Act of June 17, 1967, 60th Leg., R.S., ch. 657, 1967 Tex. Gen. Laws 1723–24. We must now determine the meaning of the term "corporate proceedings."

### Corporate Proceedings

 "Proceeding" has been defined to include "[a]n act or step that is part of a larger action" or "[a] course of action." BLACK'S LAW DICTIONARY 1221 (7th ed.1999); AMERICAN HERITAGE COLLEGE DICTIONARY 1090 (3d ed.2000). The definition of "proceeding" does not appear to have meaningfully evolved or changed during the time pertinent to our analysis. *See* WEBSTER'S NEW WORLD DICTIONARY (Modern Desk Edition 1979) (defining "proceeding" to include a "course of action"); AMERICAN HERITAGE DICTIONARY 1043 (New College Edition 1978) (defining "proceeding" to include a "course of action" or "procedure"); WEBSTER'S COLLEGIATE DICTIONARY 790 (5th ed.1943) ("proceeding" includes a "procedure," a "transaction," and an "act, measure or step in a course of business or conduct"); WEBSTER'S ELEMENTARY-SCHOOL DICTIONARY 451 (1914) ("proceeding" includes "an act of one who proceeds," "a measure or step in a course of business," and a "transaction"); WEBSTER'S COMMON SCHOOL DICTIONARY 275 (1892) ("proceeding" is a noun meaning "transaction; course; conduct"); JOHNSON & WALKER'S DICTIONARY OF THE ENGLISH LANGUAGE 570 (2d ed. 1828) (defining proceeding as including to "process from one thing to another," a "series of conduct," and a "transaction"). The word "proceeding," therefore, is a broadly defined term. However, Sembera contends that "proceedings" should be construed narrowly, encompassing only a corporate resolution approved at a meeting where a formal vote was taken and recorded in the corporate books and records.

In support of his argument, Sembera cites other Texas statutes-article 9.10 of the Texas Business Corporation Act and articles 581–7, 1396–6.06, and 1396–9.10 of the Texas Revised Civil Statutes—that refer to "proceedings." *See* TEX. BUS. CORP. ACT ANN. art. 9.10 (Vernon Supp.2007); TEX.REV.CIV. STAT. ANN. art. 581–7 (Vernon Supp.2007); TEX.REV.CIV. STAT. ANN. art. 1396–6.06 (Vernon 2003); TEX.REV.CIV. STAT. ANN. art. 1396–9.10 (Vernon 2003). In three of these articles, the term "proceedings" refers to the records of an official body. *See* TEX. BUS. CORP. ACT ANN. art. 9.10; TEX.REV.CIV. STAT. ANN. arts. 581–7, 1396–9.10. One article, article 1396–6.06, uses the term "proceedings" in a more expansive way. Still, none of these articles indicate that the legislature intended to deviate from the "ordinary meaning" of the word "proceeding" when using it in other statutory contexts. *See* TEX. GOV'T CODE ANN. § 312.002(a) ("[W]ords shall be given their ordinary meaning."). Likewise, we have discovered nothing in the wording of article 5.13, its legislative history, other statutes, or the common law that indicates the term "proceedings" has taken on a special meaning as a term of art. *See* TEX. GOV'T CODE ANN. § 312.002(b). Further, adding the word "corporate" does not create a new term, but instead, merely limits "proceedings" to those that involve a corporation's action. In our review, we have located nothing to support a conclusion that "corporate proceedings" is always a term of art with special meaning. Therefore, the term "corporate proceedings" must be understood in the context in which it appears.

Finally, although article 5.13 applies to the facts of this case before us, it will no longer apply after January 1, 2010. *See* TEX. BUS. ORGS.CODE ANN. § 402.005(a)

(Vernon Supp.2007). Following January 1, 2010, section 10.367 of the Texas Business Organizations Code will apply to cases formerly governed by the provisions of article 5.13. *See* TEX. BUS. ORGS.CODE ANN. § 10.367(b) (Vernon Supp.2007). That section reads, in pertinent part:

§ **10.367. Rights of Owners Following Termination of Right of Dissent**

. . . .

(b) On termination of the right of dissent under this section:

. . . .

(2) the owner's right to be paid the fair value of the owner's ownership interests ceases and the owner's status as an owner of those ownership interests is restored without prejudice to any interim proceeding if the owner's ownership interests were not canceled, converted, or exchanged as a result of the action or a subsequent fundamental business transaction; . . . .

TEX. BUS. ORGS.CODE ANN. § 10.367(b)(2).

We have found no case interpreting what "without prejudice to any corporate proceedings which may have been taken during the interim" means. However, the legislature, when it enacted section 10.367(b)(2), specifically stated that the dissenting shareholder's stock would be restored "if the owner's ownership interests were not cancelled, converted, or exchanged as a result of the action or a subsequent fundamental business transaction." One of the purposes of the legislature in enacting the Business Organizations Code was to "make the law ... more accessible and understandable by ... restating the law in modern American English to the greatest extent possible." TEX. BUS. ORGS.CODE ANN. § 1.001 (Vernon Supp.2007). During the process of enacting the new code, it was eventually understood by the legislature that the new code did not make any significant changes to prior law. *See* Robert W. Hamilton, *Texas Practice: Business Organizations* § 2.10 (2d ed.). As such, our interpretation of the term "corporate proceedings" is buttressed by subsequent interpretive legislative history supporting a broad meaning and applying the ordinary meaning of the two words.

For the foregoing reasons, we hold that, when the legislature enacted the current version of article 5.13, it intended that "corporate proceedings" be defined expansively and in a manner consistent with the ordinary meaning of those two words.

*Evidentiary Sufficiency*

■ Having determined that, as used in article 5.13, "corporate proceedings" is an expansive term, we now must determine if the trial court's findings of prejudice to corporate proceedings were supported by legally and factually sufficient evidence. The evidence showed that Sembera's ownership interest was redeemed by PT in a business transaction on December 31, 2001. The evidence showed that to try to reverse this transaction and restore Sembera's PT shares would create significant tax consequences for PT shareholders. Further, evidence was presented that the shares of stock in PL, the new company, had already been distributed to those who had completed the written election form and, on that form, elected to receive PL stock. To provide Sembera with PL stock would require PL to create additional shares of stock without providing any compensation for that stock or would require divesting other shareholders of their shares of stock. Those shareholders were not parties to the lawsuit in question and, thus, the trial court could not have ordered any such divestiture.

Together, this was evidence of prejudice to interim corporate proceedings. Although Sembera presented evidence con-

tradicting some of PT's evidence, it was within the trial court's province to resolve conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 820; *Canal*, 238 S.W.3d at 557–58; *Santa Fe Petroleum*, 156 S.W.3d at 638. Consequently, we must assume that, where reasonable, the trial court resolved all conflicts in the evidence in a manner consistent with its findings of prejudice. *See id.* As such, the evidence was legally sufficient to support the trial court's findings because the evidence would have enabled a reasonable and fair minded finder of fact to make them. *See City of Keller*, 168 S.W.3d at 827; *Canal*, 238 S.W.3d at 557. Likewise, the evidence was factually sufficient to support the trial court's findings of prejudice because, considering all the evidence, the findings were not clearly wrong or manifestly unjust. *See Santa Fe Petroleum*, 156 S.W.3d at 637. We overrule Sembera's first issue.

### PT STOCK ELECTION

We next consider Sembera's third issue in which he contends there was not legally and factually sufficient evidence to support the trial court's findings of fact and conclusions of law that are contrary to his ownership of shares in both PT and PL.

### Standard of Review

We have previously explained the standards of review for legal sufficiency challenges as well as factual sufficiency challenges raised by a party who did not have the burden of proof on an issue. In addition, we must consider the standard of review applicable to a party attacking the factual sufficiency of the evidence supporting an adverse finding on which it bore the burden of proof. When a party attacks the factual sufficiency of an adverse finding on an issue for which the party had the burden of proof, the party must demonstrate on appeal that the adverse finding is against the great weight and preponder-

ance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

In reviewing such a challenge, an appellate court should be mindful that the finder of fact "was not convinced by a preponderance of the evidence." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988). Again, we must remember that the trial court, as the trier of fact, is the sole judge of the credibility of the witnesses. *Canal*, 238 S.W.3d at 557 (citing *Santa Fe Petroleum*, 156 S.W.3d at 638). The trial court may take into consideration all of the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Canal*, 238 S.W.3d at 557–58 (citing *Santa Fe Petroleum*, 156 S.W.3d at 638). Where enough evidence is before the trial court so that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence, we may not substitute our judgment for that of the trial court. *Canal*, 238 S.W.3d at 558 (citing *Santa Fe Petroleum*, 156 S.W.3d at 638).

### Discussion

Sembera challenges the sufficiency of the evidence to support six findings of fact and five conclusions of law.

*Sembera's Decision*

The first two findings of fact that Sembera contends are not supported by legally and factually sufficient evidence are as follows:

13. Pursuant to authority given by the shareholders to determine the terms and conditions and to protect

the corporation's status as an S corporation, the directors of Petrofac Tyler, Inc. required each shareholder to complete a written election form as part of the sale by Petrofac Tyler, Inc. of substantially all of its assets.

. . . .

15. Plaintiff did not complete an election form as required by the Petrofac Tyler, Inc. Directors.

Hendrickson and Norton testified that the PT directors had authorized the written election form provided to each of the PT shareholders. Sembera acknowledged he had been provided an election form by PT. He further testified that he knew he was under a contractual obligation to assist PT and his fellow shareholders to retain PT's Subchapter S election.

Sembera, utilizing his MBA degree from the University of Dallas, asked Norton twenty-nine sophisticated questions concerning financial issues, management structure issues, and the tax implications of the transaction. On November 26, a week after Sembera and the other fifty PT shareholders received the election form, Norton gave Sembera a seven page single spaced document responding to each of his twenty-nine questions. Although the other fifty shareholders had made an election by early December, Sembera continued to ask Norton for extensions to make an election. His December 3 email to Norton tracked much of the shareholder election form:

**From:** Frank Sembera

**Sent:** Monday, December 03, 2001 2:51 PM

**To:** Philip Norton

**Cc:** Mike Coyne

**Subject:** CONFIDENTIAL: Shareholder Election–Frank Sembera

Philip,

Thanks for the information provided on 11/26 and 11/30. My attorney had reviewed the information regarding the proposed Petrofac Restructure and Shareholding. It is his advice that I should receive and review the New Stock Purchase Agreement prior to executing the irrevocable Election Form. Therefore, in accordance with Petrofac's advice to Shareholders to seek professional advice prior to execution of the individual Shareholder Election Form and my attorney's advice, I must withhold my election until after receipt and review of the New Stock Purchase Agreement.

As a note, it is currently my intention to elect to "receive cash and, separate from the cash, stock in a new holding company formed outside the United States following the sale of substantially all assets of Petrofac Tyler, Inc. in accordance with the terms negotiated by the Board of Directors of Petrofac Tyler, Inc."

Thanks,

Frank

Communications continued between Norton and Sembera. Norton pressed Sembera to make an election but Sembera continued delaying his decision. On December 14, Norton sent Sembera the following email:

**From:** Philip Norton

**Sent:** Friday, December 14, 2001 4:57 PM

**To:** Frank Sembera

**Cc:** Mike Coyne

**Subject:** Your Earlier Messages of December 12

Frank,

Regarding the subject messages, I would recommend for the "Petrofac Tyler, Inc. Capital Gains" message you re-

quest an individual session on December 19th (refer to my Tyler Shareholder message of today). These sessions are available from 1–3 on Wednesday.

For the "Shareholder Election–Frank Sembera" message, as noted in my message to you of December 5, 2001, your election was conditionally extended to December 7, 2001 based on fulfilling your request and providing additional time to review the related document. There has been no extension thereafter and therefrom we consider your election has been made.

Regards,

Phil

After this email, Norton continued responding to more questions and communications regarding the transaction. Sembera continued making numerous trips to the PT data room where documents detailing the transaction were provided for all shareholders. Sembera attended a December 19 shareholder meeting. On that day, the PT Board of Directors established an eight day period within which shareholders who had previously elected not to be part of the new transaction could change their election. Finally, on December 22, Sembera sent the email registering his dissent to the transaction. Hendrickson and Norton testified that this December 22 email was considered by PT to be Sembera's election to sell his shares of stock. This led to the redemption of his 5,000 shares on December 31, 2001 as contemplated by the shareholder election form.

At oral argument, Sembera contended that the December 22 email could not have been a sale of his shares because of the following additional conclusion of law entered by the trial court:

7. The December 22, 2001[ ] email from Sembera to Phil Norton[ ] was not a sale of Sembera's shares in Petrofac

Tyler, Inc.[ ] because there was no joinder of his spouse.

Implicit within this conclusion of law is a fact finding that, with "joinder of his spouse," the email would have constituted an election to sell. This is even more evident in the context of the form in which the proposed conclusion of law was submitted. As originally submitted to the trial court, the proposed conclusion of law did not include the text "because there was no joinder of his spouse." This text was added to the proposed finding before the findings and conclusions were signed. Therefore, we can discern that the trial court considered the December 22 email to be "a sale of Sembera's shares" but concluded that the sale was ineffective "because there was no joinder of his spouse." The trial court had the opportunity to make a broader ruling that would have encompassed other reasons for the email's ineffectiveness but chose not to, thereby limiting the reasons for its ineffectiveness to one single reason, "no joinder of [Sembera's] spouse."

Again, we review conclusions of law de novo, and an erroneous conclusion of law is not binding on appeal. *Canal*, 238 S.W.3d at 561. The 5,000 shares of the stock had been issued solely in the name of Sembera. Where community property is held in one spouse's name only, there is a presumption that the property is sole management community property. TEX. FAM.CODE ANN. § 3.104(a) (Vernon 2006). Absent a showing of fraud or notice on the part of persons dealing with the named spouse, the sole management presumption protects third parties who rely on the spouse's authority to deal with the property. TEX. FAM.CODE ANN. § 3.104(b) (Vernon 2006); *see Jean v. Tyson–Jean*, 118 S.W.3d 1, 5 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

Not only were the shares of stock issued in Sembera's name, but he alone signed the promissory notes for the purchase of the shares. The related stock certificates and promissory notes were offered into evidence. There was no evidence presented at trial that there was any fraud against Sembera's wife or that PT had notice that Sembera lacked authority to sell the shares without his spouse's joinder.

The stock purchase agreement was signed by both Sembera and his wife. It specifically states that it is an agreement between PT and its shareholders and their spouses. The agreement includes sections relating to how the shares were to be dealt with in the event of the death of the shareholder, the death of a spouse, and the termination of a marriage between the shareholder and spouse. Finally, the agreement provided that "such shareholders may sell all or any portion of his shares and his spouse's interests, if any." This sentence demonstrates PT's underlying belief that a shareholder could sell his spouse's interest. This same belief is apparent in the "Notice of Shareholder Election" shown above, which only the shareholder was required to sign.

Hendrickson's and Norton's testimony showed that PT believed Sembera's December 22 email constituted Sembera's election to sell his shares. Hendrickson described it as a "definitive decision." Sembera's wife was not required to sign the election form. Sembera sent the December 22 email to PT, and it was unnecessary for Sembera's wife to participate in that transaction for the email to take on the legal force of an election. The evidence establishes that the trial court erred in entering additional conclusion of law 7, and we will therefore disregard it.

Sembera contends that Norton's email of December 14 constituted PT's making his shareholder election for him. The election form itself showed December 31, 2001 as the day the shares would be redeemed. PT allowed shareholders the period from December 19 through 27 to change their election form. The tax ramifications for PT and each shareholder were a paramount consideration. Each shareholder had to make an election by the end of PT's and each shareholder's taxable year, which was December 31. Norton testified that he sent the December 14 email based on what Sembera had indicated in his December 3 email. The PT stock purchase agreement required Sembera to make an election so that the Subchapter S status of PT would be maintained. Sembera's subsequent emails of January 7 and February 8 showed he believed he had tendered his shares for redemption by PT on December 31. The evidence was also legally and factually sufficient to support the trial court's findings of facts 13 and 15. When we disregard the erroneous conclusion of law, we are left with an implicit finding of fact that Sembera's December 22 email was an election to sell his shares. Further, the evidence was legally and factually sufficient to support that implied finding of fact.

*Value of Tendered Shares*

Sembera also attacks the legal and factual sufficiency of the evidence supporting the following findings of fact and conclusions of law:

### FINDINGS OF FACT

. . . .

19. The books and records of Petrofac Tyler, Inc. reflect that effective December 31, 2001, the principal balance Plaintiff owed on the two promissory notes given for the purchase of his 5,000 shares in Petrofac Tyler, Inc. was $166,700.

. . . .

30. Petrofac Tyler, Inc. did not fail to comply with any provision of the Stock Purchase Agreement regarding plaintiff or his wife.

. . . .

34. The net value of the stock purchased by [P]laintiff and his wife, was $105,269.40.

### CONCLUSIONS OF LAW

. . . .

2. Petrofac Tyler, Inc. did not breach the Stock Purchase Agreement dated March 9, 2000 entered into by and among Petrofac Tyler, Inc. and its shareholders, including Plaintiff.

. . . .

14. Plaintiff is entitled to receive from Petrofac Tyler, Inc., in accordance with the Stock Purchase Agreement dated March 9, 2000, the sum of $105,269.40 which is the net value of his shares of stock in Petrofac Tyler, Inc.

The Stock Purchase Agreement established the formula for determining the value of Sembera's shares. A letter from the public accounting firm of Henry & Peters, P.C. of Tyler, Texas dated May 30, 2002 was entered into evidence and contained a detailed calculation, according to the Stock Purchase Agreement, showing the value of the stock on December 31, 2001. The letter stated that the value of each share was $54.39388 and the total value of Sembera's 5,000 shares was $271,969.40. Hendrickson testified from documents in evidence that Sembera owed $166,700.00 on his notes to PT. Thus, PT owed Sembera $105,269.40 for his shares on December 31, 2001.

Sembera did not produce any evidence to rebut these figures. Rather, he emphasized that he was a dissenting shareholder under the Texas Business Corporation Act and therefore entitled to restoration of his 5,000 PT shares. The trial court made a specific finding that Sembera was not a dissenter under the Texas Business Corporation Act, which has not been attacked on appeal by Sembera.

The Stock Purchase Agreement is part of the evidence before us. Sembera has not attacked its validity. The trial court made a finding of fact that Sembera and his wife executed the agreement. That finding has not been attacked on appeal. PT presented evidence that it performed its obligations under the agreement. We hold that there was legally and factually sufficient evidence to support findings of fact 19, 30, and 34 and conclusions of law 2 and 14.

*PL is not PT's Successor*

Sembera attacks finding of fact 31 and conclusions of law 24 and 25, which state:

### FINDINGS OF FACT

. . . .

31. Petrofac Limited was not the successor in interest to Petrofac Tyler, Inc.

. . . .

### CONCLUSIONS OF LAW

. . . .

24. Under the terms of the Sale and Purchase Agreement dated January 13, 2002, Petrofac Limited was obligated to issue shares to Petrofac Tyler, Inc. and not to any Petrofac Tyler, Inc. shareholder; Petrofac Tyler, Inc. had the authority to determine how to distribute the Petrofac Limited shares, and Petrofac Limited had no role or involvement in the distribution process.

25. Petrofac Tyler, Inc. fulfilled its obligations to its shareholders follow-

ing the sale of assets to Petrofac Limited on January 13, 2002.

■ PL in its cross issue contends the trial court erred when it included PL in Sembera's judgment for $105,269.40. Because these issues involve the same facts and legal issues, we will consider them together. Unobjected to evidence established that PL was a company incorporated in the Isle of Jersey on January 10, 2002. On January 13, PT sold substantially all of its assets to PL in exchange for cash and shares of PL stock. However, PT continued its existence as a Subchapter S corporation and maintained that status at the time of trial. The evidence therefore supports the trial court's finding that PL was not a successor to PT. Because of this finding, there is no connection between Sembera and PL that would support a judgment against PL. Findings of fact form the basis of a judgment. TEX.R. CIV. P. 299. As shown above, only the dealings between Sembera and PT are properly before us. We overrule Sembera's third issue and sustain PL's cross issue. Because we have sustained PL's cross issue, we need not consider PL's three conditional cross issues.

### TERMINATION OF EMPLOYMENT

In his second issue, Sembera contends that PL's termination of his employment on June 10, 2002 could not have forced him to sell his 5,000 shares in PT. We have shown above that Sembera's shares were tendered to PT on December 31, 2001 and he ceased to own shares in PT on that date. Therefore, we overrule Sembera's second issue.

### PREJUDGMENT AND POSTJUDGMENT INTEREST

In his fourth issue, Sembera contends that he is entitled to prejudgment and postjudgment interest on the judgment of $105,269.40. PT contends it made an offer of this amount to settle the dispute in both February and May of 2002. It thus contends that Sembera was not a prevailing party entitled to prejudgment interest because he refused this amount.

■ A party must prevail before it is entitled to prejudgment interest. *Cf. Apache Corp. v. Dynegy Midstream Servs., L.P.,* 214 S.W.3d 554, 566 (Tex. App.-Houston [14th Dist.] 2006, no pet.). If judgment for a claimant is equal to or less than the amount of a settlement offer of the defendant, prejudgment interest does not accrue on the amount of the judgment during the period that the offer may be accepted. TEX. FIN.CODE ANN. § 304.105(a) (Vernon 2006). Here, Sembera has not shown he is entitled to prejudgment interest because the judgment he was awarded was not more than PT's settlement offer and the amount offered was continuously available.

■ With reference to postjudgment interest, the $105,269.40 was unconditionally tendered into the registry of the trial court prior to trial. Postjudgment interest is not available when the judgment amount has been tendered with the trial court prior to the entry of judgment. *See St. Paul Mercury Ins. Co. v. Billiot,* 342 S.W.2d 161, 164 (Tex.App.-Beaumont 1960, writ ref'd.). Postjudgment interest is simply compensation for a judgment creditor's lost opportunity to invest the money awarded as damages at trial. *Miga v. Jensen,* 96 S.W.3d 207, 212 (Tex.2002). When a judgment creditor has received an unconditional tender of the money awarded, and may invest it as he chooses, there is no need for the continuing accrual of postjudgment interest. *Id.* We overrule Sembera's fourth issue.

### CONCLUSION

Because we have sustained PL's cross issue, we *reverse* Sembera's judgment

against PL and *render* judgment that Sembera take nothing against PL. Having overruled Sembera's four issues, we *affirm* the trial court's judgment for $105,269.40 against PT.[6]

---

**6.** To the extent any party has raised additional issues not addressed in this opinion, we do not consider those issues necessary to the final disposition of this appeal. Therefore, we do not address them. *See* TEX.R.APP. P. 47.1.